United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

         Plaintiff,

       v

RELIANT ENERGY SERVICES, INC,
et al,

         Defendants.

_____/

No CR 04-0125 VRW

       ORDER

      The United States has filed criminal charges against
Reliant Energy Services, Inc ("Reliant") and four Reliant
employees: Jackie Thomas, Reginald Howard, Lisa Flowers and Kevin
Frankeny (collectively "defendants"). The indictment charges each
defendant with one count of commodities price manipulation in
violation of § 9(a)(2) of the Commodity Exchange Act (CEA), 7 USC §
13(a)(2), four counts of wire fraud in violation of 18 USC § 1343
and one count of conspiracy in violation of 18 USC § 371. Doc #1
(Indictment). Defendants jointly moved to dismiss the original

indictment on vagueness and other grounds.  Doc #72 (MTD).

Subsequent to the filing of defendants' motion, the government obtained three superseding indictments.  Without abandoning their initial motion, defendants now jointly move to dismiss the third superseding indictment on the ground that it is barred by the applicable statute of limitations.  Doc #218 (MTD-3SI).  Based upon the parties' arguments and the applicable law, both motions are DENIED.

I

A

This case arises from California's electricity "crisis" in summer 2000.  In 1996, California created two new non-governmental entities to orchestrate the transmission and sale of electricity:  the California Independent System Operator ("CAISO") and the California Power Exchange ("CalPX"), both of which were California non-profit, public-benefit corporations.  Until it ceased operation in 2001, CalPX was a crucial hub of the electricity generation market, overseeing an auction system for the sale and purchase of electricity on a non-discriminatory basis to meet the electricity loads of CalPX customers, called load-serving entities ("LSEs"), that provide electricity to retail, end-use customers.  CalPX's auctions ran on a day-ahead and same-day basis.  CalPX would determine, on an hourly basis, a single "market clearing price" which all electricity wholesalers would be paid based on <u>short-term</u> supply and demand bids submitted by all CalPX participants ("spot market").  In addition, CalPX operated a block forward market by matching supply and demand bids for <u>long-term</u>

electricity contracts ("term market").

Responsibility for the efficient functioning of the high-voltage transmission grid fell to CAISO and, to that end, it ran the spot market for electricity.  During the time period in question in this case, if consumer demands were not met by scheduled supplies into CalPX or other sources, CAISO was required to procure additional electricity to serve consumers' requirements and maintain the stability of the grid.  To facilitate this, CAISO purchased reserve capacity from wholesalers.  This reserve capacity was left idle until CAISO required additional generation of power.  If CAISO required additional generation of power, it issued an order to the wholesaler to generate such power out of the reserve capacity; if not, the reserve capacity was left ungenerated.  The CAISO-operated market was called the "real time" or "imbalance" market.

While CAISO and CalPX were organized under California law, both were subject to the jurisdiction and regulation of the Federal Energy Regulatory Commission (FERC).  Under the Federal Power Act (FPA), FERC has jurisdiction over "the sale of electric energy at wholesale in interstate commerce," 16 USC § 824(b), but the California Public Utility Commission retained jurisdiction over all retail sales of electricity in California.

While LSEs had sources of electricity that they themselves owned or controlled (e g, nuclear, hydraulic), retail customer demand for electricity greatly exceeded this source of supply.  The court will refer to this excess demand for an LSE's supply as the LSE's "net short."  CalPX operated as the exclusive market for LSEs' net short electricity needs.  LSEs were required

United States District Court

For the Northern District of California

3

to purchase the majority of their net short demand in the CalPX spot market.

Reliant, based in Houston, Texas, owns five generation plants in southern California. According to the indictment, in early June 2000, defendant Flowers (on behalf of Reliant) entered into long-term trading contracts for electricity delivery for the third quarter of 2000 and 2001, expecting that electricity prices would increase. Indictment ¶16. On June 19, 2000, however, the spot market price for electricity unexpectedly fell. Based upon the trading contracts entered into by Flowers and the sharply decreased market price, defendants determined that Reliant was facing a multi-million dollar loss. Id. To avoid this loss, the indictment alleges that defendants conspired to manipulate (and did manipulate) the California electricity market to increase the price of electricity.

Specifically, the government asserts that defendants manipulated the market by creating a false and misleading appearance of an electricity supply shortage to CalPX, CAISO and other market participants. Id ¶19. Defendants were able to create this illusion of a supply shortage by (1) shutting down some of Reliant's generation plants, (2) physically withholding electricity from the spot market, (3) submitting supply bids at inflated prices to ensure that the bids were not accepted and (4) disseminating false and misleading rumors and information to CAISO, brokers and other traders regarding the availability and maintenance status of, and environmental limitations on, Reliant's southern California generation plants. Id.

//

The government asserts that defendants' scheme was successful; by June 21, 2000, the purported electricity supply shortage had caused the spot market price of electricity to soar. The indictment alleges that defendants took advantage of the artificial price they had created by selling large amounts of electricity at this inflated price. Ultimately, the government alleges, instead of suffering a loss, Reliant made millions in profits and that California electricity purchasers overpaid by as much as $32 million.

Based upon defendants' alleged conspiracy, scheme to defraud and manipulation, the state of California filed a civil suit against Reliant and the government filed the criminal charges at issue here. Count one of the indictment charges defendants with conspiring to commit wire fraud and commodities price manipulation in violation of 18 USC § 371. Counts two through five charge defendants with wire fraud in violation of 18 USC § 1343. Finally, defendants are charged in count six with violating § 9(a)(2) of the CEA, 7 USC § 13(a)(2), which in pertinent part makes it a crime for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce" (hereinafter the "criminal manipulation provision").

**B**

After defendants jointly moved to dismiss the original indictment, the government obtained a superseding indictment on June 29, 2005 ("Indictment S1"), and a second superseding indictment on October 11, 2005 ("Indictment S2"). Doc ##231 (1SI), 181. Trial in this matter was scheduled to commence October 31,

United States District Court

For the Northern District of California

2005.  A pre-trial conference was held on October 17, 2005, and after reviewing the parties' proposed jury instructions, the court served upon the parties its own proposed final jury instructions on October 24, 2005.  On October 25, 2005, the government obtained a third superseding indictment ("Indictment S3").  Doc #208 (3SI). On October 28, 2005, defendants filed a joint motion to dismiss Indictment S3.  Doc #218.

Also on October 28, 2005, the Friday before trial was to commence, the government, pursuant to 18 USC § 3731, filed a notice of appeal of one of the court's pre-trial evidentiary rulings.  Doc #219.  Upon receipt of the government's notice of appeal, the court conveyed to the parties its understanding that the government's § 3731 filings "would divest the court of jurisdiction over aspects of the case that are involved in the appeal and prevent the court from empaneling a jury during the pendency of the appeal."  Doc #216 (citations omitted).  The court nonetheless requested the parties to appear as scheduled on October 31, 2005, in order to discuss certain matters.  Id.  One matter the parties took up at that time was the court's jurisdiction to hear and rule upon defendants' motion to dismiss Indictment S3 during the pendency of the appeal, the issue to which the court now turns.

II

A

A trio of Ninth Circuit opinions guides the court: United States v Gatto, 763 F2d 1040 (9th Cir 1985), United States v Emens, 565 F2d 1142 (9th Cir 1977), and United States v Cox, 475 F2d 837 (9th Cir 1973).

6

In <u>Cox</u>, the district court granted the defendants' motion to suppress and, apparently, the government timely appealed pursuant to § 3731.  During the pendency of the appeal, the defendant moved to dismiss the indictment.  "[C]oncerned as he was with the aspects of the guarantee of speedy trial within the sixth amendment," the district court granted the motion to dismiss, and the Ninth Circuit unanimously affirmed.  <u>Cox</u>, 475 F2d at 841.  Although it is not perfectly clear whether the court viewed the issue as one of jurisdiction, significantly, the <u>Cox</u> panel did not conclude that the district court lacked jurisdiction to dismiss the indictment due to the government's pending § 3731 appeal.

In <u>Emens</u>, the Ninth Circuit clarified that <u>Cox</u>'s holding was indeed jurisdictional in nature.  In rejecting the government's argument that "§ 3731 impliedly prohibits a District Court from dismissing an indictment pending appeal of an order granting a motion to suppress evidence," the panel explained that under <u>Cox</u>, "the District Court has the naked power, in appropriate cases, to dismiss an indictment during appeal time."  <u>Emens</u>, 565 F2d at 1144.  The panel declined, however, to address whether the district court's exercise of that power was appropriate, and instead remanded on the distinct (but for present purposes not irrelevant) ground that the district court erred in concluding that it lacked jurisdiction to reconsider the evidentiary ruling from which appeal was taken.  Id.

Most recent and instructive is <u>Gatto</u>.  In <u>Gatto</u>, four days before trial, the district court exercised its supervisory power to exclude evidence that was the byproduct of perceived misconduct by law enforcement agents.  The government timely

**7**

United States District Court

For the Northern District of California

appealed under § 3731 and refused to proceed to trial after the district court declined to stay proceedings pending the appeal. The government's appeal was rewarded by the district court dismissing the indictment with prejudice on the ground that the government had unnecessarily delayed prosecution.

On appeal, the Ninth Circuit rejected the government's argument —— the same argument the government advances here —— "that the district court lost jurisdiction over the action when the government filed its notice of appeal pursuant to 18 USC § 3731 to challenge the exclusionary order." 763 F2d at 1049. Quoting Griggs v Provident Consumer Discount Co, 459 US 56 (1982), the case upon which the government principally relies, the panel acknowledged that "[i]n the usual circumstance, the filing of a notice of appeal confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Gatto, 763 F2d at 1049 (quotations and alterations omitted) (emphasis added). But the court went on: "Section 3731 appeals, however, are not usual. As we previously observed [in Cox and Emens], a district court retains the naked power, in appropriate cases, to dismiss an indictment while a section 3731 appeal from a pretrial order is pending. We believe this to be a sound policy." Id (emphasis added).

The court proceeded to debunk the notion that the government's right to appeal mandates unqualified jurisdictional deference by district courts without regard to a defendant's interest in swift proceedings:

> The government has a conditional right to appeal a suppression order, but the exercise of that right may result in a disruptive effect on the criminal

1

2

3

4

> trial process, therefore harboring a potential for
> abuse.  As a result, the government's right to
> appeal pretrial suppression orders must be balanced
> with a defendant's right to proceed to trial on the
> indictment.  This can best be accomplished * * * by
> retaining jurisdiction in the district court to
> dismiss the indictment in appropriate cases.

5  Id at 1050.

6        The government's appeal on the eve of trial in a matter

7  of the magnitude, apparent public importance and complexity of the

8  case at bar is, to say the very least, a "fly in the ointment."

9  10/31/05 Tr at 5:10.  This case involves a large corporation, four

10  individual defendants and teams of lawyers.  The duration of the

11  trial will be measured in weeks or months, not days.  Due to the

12  publicity surrounding the events that led to this prosecution, only

13  a very large jury venire will yield a panel of twelve jurors who

14  are both impartial and available for the duration of the

15  proceedings.  The defendants have already once anticipated, and the

16  court has once made preparations for, the commencement of trial ——

17  for naught.  It is surprising that the government would deem a case

18  of this nature seriously jeopardized by the evidentiary ruling that

19  sparked the present appeal.  A weighty prosecution is seldom landed

20  on light tackle.  In light of the government's representation that

21  it would appeal dismissal of Indictment S3 (presumably even if the

22  court did not dismiss any other operative charging instrument),

23  10/31/05 Tr at 11:23-12:2, piecemeal resolution of pre-trial issues

24  is a palpable concern.

25        Given these circumstances, this is an "appropriate

26  case[]," Gatto, 763 F2d at 1050, for the court to entertain a

27  motion to dismiss during the pendency of a § 3731 appeal of an

28  evidentiary ruling.  Moreover, the undersigned perceives little

**United States District Court**
For the Northern District of California

**9**

United States District Court

For the Northern District of California

risk that this court and the Ninth Circuit will be "stepping on each other's toes." United States v Ienco, 126 F3d 1016, 1018 (7th Cir 1997) (Posner, J). Despite the passage of almost four months since the government filed its notice of appeal, the government has not even filed its opening brief in the court of appeals, cf 18 USC § 3731 (mandating that interlocutory appeals by the government be "diligently prosecuted"); United States v Jenkins, 490 F2d 868, 869 (2d Cir 1973) (Friendly, J) (stating that a delay of several months between the government's notice of appeal and filing of its opening appellate brief "scarcely conforms with our notion of diligent prosecution and we would have dismissed the appeal on that ground if defendant had so requested"); United States v Goldstein, 479 F2d 1061, 1064 n 4 (2d Cir 1973) ("In view of the statutory command of diligent prosecution, we believe that the Government's brief in appeals of this sort should ordinarily be filed within 30 days after the notice of the appeal."). Government counsel represented to the court that the government would "expeditiously" pursue the requisite approval of the Solicitor General and subsequently "file a motion to expedite the appeal in order to move this matter as quickly as possible toward a resolution in the court of appeals," 10/31/05 Tr at 5:17-23. A four-month delay in filing an opening brief serves only to thicken the riddle of the government's conduct.

Having concluded that the government's appeal does not divest the court of jurisdiction to rule upon defendants' motion to dismiss Indictment S3, the court turns to that motion.

//

//

United States District Court

For the Northern District of California

**B**

Defendants argue that Indictment S3 is barred by the five-year statute of limitations applicable to non-capital federal offenses, 18 USC § 3282.  Specifically, defendants contend that because Indictment S3 is substantially broader than Indictment S1 (the last timely filed indictment) with respect to the conspiracy and wire fraud charges, Indictment S3 cannot relate back to Indictment S1 for limitations purposes.

"Generally speaking, the return of an indictment tolls the statute of limitations with respect to the charges contained in the indictment.  If a superseding indictment on the same charges is returned while a previous indictment is still pending, the tolling continues."  United States v Pacheco, 912 F2d 297, 305 (9th Cir 1990) (citations omitted).  Tolling does not continue, however, if the superseding indictment "broadens or substantially amends the charges in the original indictment."  United States v Sears, Roebuck & Co, 785 F2d 777, 778 (9th Cir 1986) (quotations and alterations omitted).

The case law does not indicate any formula for determining whether a superseding indictment is substantially broader than its timely filed predecessor, but one principle guides the way in all cases:

> Notice to the defendant is the central policy underlying the statute of limitations.  If the allegations and charges are substantially the same in the old and new indictments, the assumption is that the defendant has been placed on notice of the charges against him.  That is, he knows that he will be called to account for certain activities and should prepare a defense.

Pacheco, 912 F2d at 305 (quoting United States v Italiano, 894 F2d

11

1280, 1283 (11th Cir 1990)); accord <u>United States v Salmonese</u>, 352 F3d 608, 622 (2d Cir 2003) ("No single factor is determinative; rather, the 'touchstone' of our analysis is notice, i e, whether the original indictment fairly alerted the defendant to the subsequent charges against him and the time period at issue."); <u>United States v Schmick</u>, 904 F2d 936, 940 (5th Cir 1990) ("[N]otice is the touchstone in deciding whether a superseding indictment substantially changes the original charges.").

"To determine whether the superseding indictment impermissibly changed the charges in the original indictment it is necessary to examine the two indictments carefully." <u>Sears, Roebuck & Co</u>, 785 F2d at 779.  To that task the court now turns.

C

The court begins by observing what has not changed.  Like its predecessors, Indictment S3 charges each defendant with one count of conspiracy, four counts of wire fraud and one count of commodities price manipulation.  Thus, Indictment S3 "neither added new charges nor rendered [defendants] susceptible to increased punishment." <u>Schmick</u>, 904 F2d at 941.  Furthermore, "[t]he dates of the conspiracy remain the same." <u>United States v Lash</u>, 937 F2d 1077, 1082 (6th Cir 1991).  Finally, Indictment S3 recites without modification the same four factual allegations that are the nucleus of this prosecution (the "four key acts"):

> (a)  the shut down of certain of defendant Reliant's power plants in California;
>
> (b)  the physical and economic withholding of electricity from the California spot markets, by declining to submit supply bids and by submitting false and misleading supply bids at

1

                    prices designed to ensure that the bids were
not accepted;

2

      (c)    the exacerbation of the supply shortage through
the purchase of additional electricity from the
PX and other markets to cover Reliant's
preexisting delivery commitments;

3

4

5

      (d)    the dissemination of false and misleading
rumors and information to the ISO, brokers, and
other traders regarding the availability and
maintenance status of, and environmental
limitations on, defendant Reliant's power
plants.

6

7

8

Compare 1SI ¶19 with 3SI ¶19.  And both indictments characterize

9

these four key acts as "conduct that was designed to create and did

10

create the false and misleading appearance of an electricity supply

11

shortage to the market."  Id.

12

        Defendants focus on the elimination of references to

13

"artificial" electricity prices in the allegations of

14

conspiratorial objectives, unlawful means, sources of injury, overt

15

acts and wire transmissions.  For example, where ¶21 of Indictment

16

S1 alleged that the "conspiracy, scheme to defraud, and

17

manipulation" caused CalPX and CAISO to publish, pay and charge

18

"artificially inflated" or "artificially higher" spot prices for

19

electricity, corresponding ¶20 of Indictment S3 alleges that "[i]t

20

was an important part of the scheme to defraud that any increase in

21

spot electricity prices" would be published, paid and charged by

22

CalPX and CAISO.  And where ¶22 of Indictment S1 alleged that

23

Pacific Gas & Electric Co ("PG&E") "submitted higher-priced demand

24

bids and paid artificially higher prices" for spot electricity and

25

ancillary services "[a]s a result of the defendants' conspiracy,

26

scheme to defraud, and manipulation," corresponding ¶21 of

27

Indictment S3 alleges that it was "an important part of the scheme

28

United States District Court

For the Northern District of California

13

to defraud" that PG&E and other market participants would submit bids and pay prices "that were higher than they would have been if not for the defendants' conduct."  Similarly, where ¶28 of Indictment S1 alleged overt acts that included causing CalPX to publish "artificially inflated spot prices," corresponding ¶26 of Indictment S3 alleges the publication of prices "that were higher than they would have been absent the defendants' conduct."

These changes reflect deletions rather than additions. Defendants nonetheless argue that Indictment S3 is broader than Indictment S1.  According to defendants, under Indictment S1, the government could not obtain a conviction on the wire fraud charges unless the jury found that the defendants' alleged misrepresentations caused the price of electricity to be artificial.  This is so, defendants argue, because the purpose of the scheme to defraud alleged in Indictment S1 was to inflate the price of electricity artificially.  Because the four wire transactions alleged in the indictment all occurred after the prices were alleged to have become artificially inflated, if electricity prices were not in fact artificially inflated, the wires could not have been used in furtherance of the scheme alleged in Indictment S1.  But under Indictment S3, defendants contend, the jury could convict on the wire fraud and conspiracy counts if it were to find that defendants made misrepresentations but that higher electricity prices were caused by defendants' legitimate supply and demand decisions and not their misrepresentations. Thus, in defendants' view, the government has broadened its theory on the wire fraud counts.

//

United States District Court

For the Northern District of California

Defendants conceded at oral argument that for purposes of the present motion it is not necessary to resolve the question whether proof of an artificial price was necessary to sustain convictions for wire fraud under Indictment S1. In any event, a "finding that the alleged objectives of the scheme differ between the two indictments does not end [the] inquiry." <u>Italiano</u>, 894 F2d at 1285; cf <u>United States v Gengo</u>, 808 F2d 1, 3 (2d Cir 1986) (holding that new conspiratorial objectives did not prevent superseding indictment from relating back). Because notice is the touchstone, "the crucial inquiry is whether approximately the same facts were used as the basis of both indictments." <u>Italiano</u>, 894 F2d 1285; cf <u>United States v Charnay</u>, 537 F2d 341, 354 (9th Cir 1976) (quoting <u>Mende v United States</u>, 282 F2d 881, 883-84 (9th Cir 1960)).

In this regard, defendants propose that the price of electricity is "the one critical fact" linking the four key acts to the wire fraud counts. MTD-3SI at 10. Because an artificially inflated price is, in defendants' view, "worlds apart" from a merely higher price, the critical facts of the two indictments are not approximately the same. Id.

The court first notes that Indictment S3 does not speak in terms of "merely higher" prices, but rather "fraudulently increas[ed]" prices, 3SI ¶19, and "prices that were higher than they would have been absent the defendants' conduct," id ¶26. And as defendants are no doubt well aware, every indictment in this case has proceeded from the premise that the same four key acts caused electricity prices to be higher than they otherwise would have been. So even accepting defendants' hypotheses that (1)

United States District Court

For the Northern District of California

electricity prices somehow provide the "missing link" to the
alleged wire fraud and (2) "[w]hether electricity prices were
artificially inflated —— rather than merely higher —— is a fact,"
Doc #229 at 3, the allegations regarding prices do not differ by
much, if at all.  For in the context of this prosecution, to
ascribe the term "artificial" to a price that is higher than it
would have been absent the four key acts is merely to imply that
the resulting prices did not reflect the legitimate forces of
supply and demand, i e, that the four key acts constituted
illegitimate market forces.  See *infra* III(A)(3)(c)(i).  Viewed in
this light, the new indictment simply omits the characterization
(implicit in the term "artificial") that the higher prices brought
about by defendants' conduct did not reflect legitimate market
forces.  If anything, then, the Indictment S3 has omitted, rather
than added or changed, facts; under this circumstance, the court
perceives the factual allegations, if any different, to be
narrower, not broader.  And if the difference between artificially
higher prices and higher prices brought about by the four key acts
is what distinguishes Indictment S3 from its predecessors (and
bearing in mind that notice is the touchstone of the court's
inquiry), defendants' argument is strained at best.  This argument
rests on the premise that defendants were not on notice that the
four key acts did <u>not</u> constitute illegitimate market forces.  The
court finds this argument unpersuasive.  Cf <u>United States v Miller</u>,
471 US 130, 131 (1985) (holding that the Fifth Amendment right not
to be prosecuted except upon indictment by a grand jury is not
violated "when a defendant is tried under an indictment that
alleges a certain fraudulent scheme but is convicted based on trial

16

proof that supports only a significantly narrower and more limited, though included, fraudulent scheme").

Further, allegations regarding the artificiality of electricity prices (or lack thereof) are not allegations regarding defendants' activities, i e, what defendants actually said or did (or did not say or do).  Statutes of limitations are particularly concerned with acts, not facts generally.  Judge Pollack implicitly recognized as much in United States v O'Neill, 463 F Supp 1205 (ED Pa 1979), a case upon which defendants heavily rely.  O'Neill involved a prosecution for, among other charges, a violation of 18 USC § 1014, which prohibits the making of false statements to certain federally chartered lenders in connection with loan applications.  Although both indictments alleged misrepresentations in connection with the same loan application, the two misrepresentations alleged in the superseding indictment were completely different from the single misrepresentation alleged in the original indictment.  Judge Pollack observed that statutes of limitations are intended to ensure "that a defendant receives notice, within a prescribed time, of the acts with which he is charged, so that he and his lawyers can assemble the relevant evidence before documents are lost, memory fades, etc."  Id at 1208 (emphasis added).  Judge Pollack dismissed the § 1014 count because "[t]he original indictment, alleging a single misrepresentation, could not have put the defendant on notice that he might face a revised indictment alleging two quite different misrepresentations."  Id.  In stark contrast, Indictment S3 does not allege anything new or different in terms of what defendants said or did.

United States District Court

For the Northern District of California

In sum, the claim that Indictment S1 and its predecessor did not place defendants on notice of the conduct and violations of law charged in Indictment S3 ultimately rings hollow.  Nothing has changed in terms of the statutes violated, the time period of the alleged scheme, the four key acts or any other allegations regarding what defendants actually said or did.  The differences upon which defendants seize, in essence, all amount to omissions of the allegation that the higher electricity prices, which were the object, means and resulting injury of the conspiracy and scheme to defraud, did not reflect the legitimate forces of supply and demand.  This omission did not result in a broader or substantially amended indictment.  Indictment S3 therefore relates back to Indictment S1, and defendants' motion to dismiss Indictment S3 as time-barred is accordingly DENIED.

Having concluded that Indictment S3 is not barred by limitations, the court turns to defendants' substantive arguments for dismissing this prosecution.  As noted, three superseding indictments have been returned since defendants moved to dismiss the original indictment.  The court construes defendants' motion as directed toward any indictment upon which the government can proceed.  See United States v Holm, 550 F2d 568, 569 (9th Cir 1977) ("It is undisputed that the Government may have two indictments outstanding against an accused at the same time.").  Because it is clear that the government plans to proceed to trial on Indictment S3, the court will discuss defendants' motion against that backdrop (and in the interest of simplicity, will henceforth refer to Indictment S3 simply as the "indictment").

//

United States District Court

For the Northern District of California

### III

It is appropriate to address first defendants' challenges to count six.  Defendants advance several arguments.  First, defendants argue that the criminal manipulation provision is unconstitutionally vague on its face and as applied to the case at hand.  Assuming the criminal manipulation provision is not vague, defendants alternatively argue that (1) the CEA does not apply to the wholesale electricity market, (2) application of the CEA to defendants' conduct violates the filed rate doctrine and (3) the conduct alleged in the indictment does not constitute criminal manipulation.

### A

"A statute is void for vagueness if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes * * *."  <u>United States v Doremus</u>, 888 F2d 630, 634 (9th Cir 1989) (citing <u>Schwartzmiller v Gardner</u>, 752 F2d 1341, 1345 (9th Cir 1984)).  In other words, a defendant has adequate notice if a person of ordinary intelligence would understand that his or her conduct is prohibited by the law in question.

Although the criminal manipulation provision does not specify a required *mens rea*, the government accepts that specific intent is required.  Doc #81 (Opp) at 13 ("The price manipulation provision * * * criminalizes the knowing and intentional manipulation or attempted manipulation of a price or commodity in interstate commerce * * *.").  Although a specific intent requirement will generally thwart a defendant's vagueness argument,

19

it will "not necessarily validate a criminal statute against all vagueness challenges." United States v Bohonus, 628 F2d 1167, 1174 (9th Cir 1980).  Hence, there is a small group of cases in which a defendant may have the required *mens rea*, but the *actus reus* which is prohibited by the statute is undefined or unclear and cannot form the basis of a criminal conviction (i e, the defendant commits the prohibited conduct with specific intent, yet a person of ordinary intelligence would not understand what physical acts are within the scope of the statute's *actus reus*).  See United States v Screws, 325 US 91, 105 (1945) (stating that "willful conduct cannot make definite that which is undefined").  Defendants assert that this is such a case.

The *actus reus* of the criminal manipulation provision is "manipulation."  The term "manipulate" is not defined in the CEA. Omission of a statutory definition of a term, however, does not necessitate a finding that the statute is impermissibly vague. Rather, the court "will normally construe [the term] in accord with its ordinary meaning" to determine whether a person of ordinary intelligence would understand that defendant's conduct was prohibited by the statute.  Smith v United States, 508 US 223, 228 (1993) (citing Perrin v United States, 444 US 37, 42 (1979)); see also United States v Iverson, 162 F3d 1015, 1022 (9th Cir 1998) ("When a statute does not define a term, we generally interpret that term by employing the ordinary, contemporary and common meaning of the words that Congress used.").  Moreover, a "vagueness challenge will not be upheld if judicial explication of a statute provides sufficient clarity to afford fair notice." Bohonus, 628 F2d at 1174.  And where, as here, "a criminal statute regulates

United States District Court

For the Northern District of California

economic activity, it generally is subject to a less strict vagueness test because its subject matter is more often narrow and because businesses can be expected to consult relevant legislation in advance of action."   Iverson, 162 F3d at 1021.

With these principles in mind, the court turns to the arguments advanced by defendants in connection with their vagueness challenge.

1

Defendants make much of the fact that, "[i]n the 68 years since commodity 'manipulation' was made a crime, there has never been a reported criminal prosecution" —— until now.   MTD at 8. Yet, as Judge Selya stated when presented with this argument by a criminal defendant:  "There is a first time for everything." United States v Nippon Paper Industries Co, Ltd, 109 F3d 1, 6 (1st Cir 1997).  There had to be a first time a defendant was prosecuted for price fixing under the Sherman Act.  There had to be a first time a defendant was charged with illegal dumping under the Clean Water Act.  The fact that this might be the government's premiere criminal prosecution under the criminal manipulation provision does not itself answer the court's inquiry whether the statute is unconstitutionally vague.  See United States v Kinzler, 55 F3d 70, 74 (2d Cir 1995) ("The claimed novelty of this prosecution does not help [defendant's vagueness challenge], for 'it is immaterial that "there has been no litigated fact pattern precisely in point."'" (quoting United States v Ingredient Technology Corp, 698 F2d 88, 96 (2d Cir 1983) (quoting United States v Brown, 555 F2d 336, 339-40 (2d Cir 1977)))).

United States District Court

For the Northern District of California

To be sure, a gap of two generations between enactment of a statute and prosecution under that statute is certainly a surprise.[1]  If commodities price manipulation were sufficiently harmful to society to require a criminal prohibition, it seems strange that it would take the government this long to get around to enforcing the statute.  Surely, if there is such a thing as criminal market manipulation, the California energy crisis in the early 21st century cannot be the first instance of such conduct.  Perhaps, the government has been able to deal with market manipulation through other criminal laws.  If so, one wonders what a prosecution under the CEA adds to the government's law enforcement arsenal?  But the absence of prior prosecutions is not enough to support dismissal of the indictment.

2

Next, defendants argue that the CEA's criminal manipulation provision is void for vagueness on its face.

"'The threshold question in any vagueness challenge is whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in the particular case.'"  <u>Doremus</u>, 888 F2d at 634 (quoting <u>Schwartzmiller v Gardner</u>, 752 F2d 1341, 1345 (9th Cir 1984)).  "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the

---

[1] In fact, it appears that § 9(a)(2) has been criminally enforced in the past, but it also appears that those actions were not the subject of reported opinions.  See Jerry W Markham, <u>Manipulation of Commodity Futures Prices ── The Unprosecutable Crime</u>, 8 Yale J on Regulation 281, 318 & n 258, 328 & n 329, 375 & n 604 (1991).

facts at hand." United States v Mazurie, 419 US 544, 550 (1975)
(citing United States v Nat'l Dairy Products Corp, 372 US 29
(1963)); see also United States v Fitzgerald, 882 F2d 397, 398 (9th
Cir 1989) ("[B]ecause this action does not involve [F]irst
[A]mendment rights, this court need only examine the vagueness
challenge under the facts of the particular case * * *.").

Because defendants do not contend that the criminal
manipulation provision implicates their First Amendment rights,
their facial challenge to the criminal manipulation provision
fails.

3

Defendants argue that the criminal manipulation provision
is unconstitutionally vague as applied for three reasons: (1) the
term "manipulate" has no ordinary or plain meaning, (2) judicial
explication has not remedied the term's ambiguity and (3) the
legislative history of the CEA fails to evidence a sufficient
definition of the term. In supplemental briefing, defendants
further argue that by choosing to pattern a recent anti-
manipulation amendment to the FPA after § 10(b) of the Securities
Exchange Act of 1934 rather than the CEA, Congress implicitly
recognized that the criminal manipulation provision is
unconstitutionally vague. Doc #158 at 4.

a

As mentioned above, when a term lacks a statutory
definition, the court will normally construe the term in accord
with its ordinary meaning. Smith, 508 US at 228. This canon of

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

construction begins by examining the term's dictionary definition.
See <u>United States v Akintobi</u>, 159 F3d 401, 403 (9th Cir 1998)
(using a dictionary to construe the term "proceeds" in the federal
money laundering statute); <u>Iverson</u>, 162 F3d at 1023 (construing the
term "responsible corporate officer" in the Clean Water Act in
accord with the dictionary definition of "responsible").

As pertinent here, one modern dictionary defines
"manipulate" as "to control, manage or play upon by artful, unfair
or insidious means[;] esp to one's own advantage." <u>Webster's Third
New Int'l Dictionary</u> 1376 (1981); see also <u>The Oxford American
Dictionary and Language Guide</u> 604 (1999) (defining manipulate as to
"manage (a person, situation, etc) to one's own advantage, esp
unfairly or unscrupulously").  Based on this definition, a person
who "manages, controls or plays upon" the price of a commodity in
interstate commerce by "artful, unfair or unscrupulous means" may
be liable for criminal price manipulation under the CEA.
Defendants characterize this ordinary meaning as full of "vague and
subjective concepts."  MTD at 12.  The court shares defendants'
concern to some extent.  Terms such as "unfairly," "unscrupulously"
and the like are too subjective to afford a determinable legal
standard by which criminal liability may be imposed.

Because a term's ordinary meaning should be assessed as
of the time Congress enacted the provision at issue, dictionary
definitions contemporaneous with enactment are most useful.  See
<u>Perrin</u>, 444 US at 42; see also <u>United States v Auginash</u>, 266 F3d
781, 784-85 (8th Cir 2001) (looking to contemporary dictionary
definition to resolve vagueness issue).  Congress enacted § 9(a)(2)
in 1936.  Commodity Exchange Act of 1936, 49 Stat 1491.  At that

United States District Court
For the Northern District of California

time, Webster defined "manipulate" as "to manage or treat artfully or _fraudulently_."  _Webster's New Int'l Dictionary_ 1496 (2d ed 1934) (emphasis added); see also _Ernst & Ernst v Hochfelder_, 425 US 185, 199 & n 21 (1976) (relying in part upon this dictionary definition and stating that the word "manipulative" as used in § 10(b) of the Securities Exchange Act of 1934 "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities").  To the extent § 9(a)(2) of the CEA makes it a crime to "manage" the price of a commodity in interstate commerce by "fraudulent" means, the court is less inclined to agree that the term "manipulate" provides too vague a standard.

b

        Any uncertainty surrounding the term "manipulation" has been to an extent clarified by judicial explication.  As defendants observe, the term "manipulation," like any term left to judicial interpretation, did not have a fixed meaning at the CEA's incipiency or during its adolescence.

        In more recent times, however, courts and the Commodities Future Trading Commission (CFTC) appear to have settled on a similar definition:  "Manipulation, broadly stated, is an intentional exaction of a price determined by forces other than supply and demand."  _Frey v CFTC_, 931 F2d 1171, 1175 (7th Cir 1991); accord _In re Abrams_, No 88-10, 1994 WL 506250, *10 (CFTC 1994) ("A market participant must have acted with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and

demand * * *." (internal quotations omitted)); <u>In re Soybean</u>
<u>Futures Litigation</u>, 892 F Supp 1025, 1044 (ND Ill 1995)
("[M]anipulation is intentional conduct that has resulted in a
price which does not reflect basic forces of supply and demand."
(internal quotations omitted)); <u>Cargill, Inc v Hardin</u>, 452 F2d
1154, 1163 (8th Cir 1971) ("The aim must be * * * to discover
whether conduct has been intentionally engaged in which has
resulted in a price which does not reflect the basic forces of
supply and demand."); cf <u>United States v Socony-Vacuum Oil Co</u>, 310
US 150, 223 (1940) (explaining in the antitrust context that
"market manipulation in its various manifestations is implicitly an
artificial stimulus applied to * * * market prices, a force which
distorts those prices, a factor which prevents the determination of
those prices by free competition alone").

To this end, the courts and the CFTC have adopted four
necessary elements an accuser must prove to prevail on a
manipulation claim:  (1) the defendants possessed the ability to
influence prices, (2) an artificial price existed, (3) the
defendant caused the artificial price and (4) the defendant
specifically intended to cause the artificial price.  <u>Soybean</u>
<u>Futures</u>, 892 F Supp 2d at 1045 (citing <u>Frey</u>, 931 F2d at 1173-78,
and <u>In re Abrams</u>, 1994 WL 506250, *10); <u>In re Fenchurch Capital</u>
<u>Management, Ltd</u>, No 96-7, 1996 WL 382313, *5 (CFTC 1996).

This judicially explicated definition of manipulation is
consistent with the term's ordinary meaning.  "To control, manage
or play upon" is embodied by the judicial requirement that the
conduct be intentional and with purpose.  Moreover, this
intentional conduct must be directed at something such as a person

United States District Court

For the Northern District of California

or a situation; under the criminal manipulation provision, the conduct must be directed at the price of a commodity in interstate commerce.  Further, in the context of commodities trading and selling, it would be "artful" to affect intentionally the price of a commodity so that the price does not reflect the basic forces of supply and demand.  Finally, as discussed below, one can create an artificial price by acting "fraudulently."

                              c

     Perhaps realizing that the judicial explication of the term "manipulate" is in line with the term's ordinary meaning, defendants' reply memorandum singles out a different term —— "artificial price" —— and attempts to demonstrate why this term's proposed definition is unconstitutionally vague.  Doc #83 (Reply) at 10-13 (stating that "the concept of basic supply and demand does not provide meaning for the term 'manipulate'").  The court addresses defendants' arguments in turn.

                              i

     First, defendants posit that criminalizing conduct undertaken with the intent to create a price that does not reflect the basic forces of supply and demand would "require businesses to guess what the 'reasonable' or 'real' value of a good was in order to conform their conduct to the law."  MTD at 18.  In other words, defendants argue that the criminal manipulation provision requires them first to guess what the price of a commodity would be if the forces of supply and demand were uninhibited (i e, guess what the "reasonable" or "real" price would be) and then avoid conduct that

27

United States District Court

For the Northern District of California

would cause the price of the commodity to deviate from this reasonable price. Because "[t]he Supreme Court has struck down as unconstitutionally vague other statutes that similarly required businesses to guess" at a reasonable price, defendants argue that the court must find the criminal manipulation provision unconstitutionally vague as applied. Id (citing <u>United States v Cohen Grocery Co</u>, 255 US 81, 89 (1921), and <u>International Harvester Co of America v Kentucky</u>, 234 US 216, 222 (1914)). This argument is unconvincing.

In <u>Cohen Grocery</u>, the statute in question made it "unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries." 255 US at 86. Defendant was charged with selling sugar at an unjust and unreasonable rate; it sold a 50-pound bag of sugar for $10.07 and a 100-pound bag of sugar for $19.50. Id. But there was no set rate for sugar that was reasonable *per se*. Hence, the Court found the statute impermissibly vague because no one can "foreshadow or adequately guard against" a price that would be considered "unreasonable." Essentially, every time a dealer sold a bag of sugar, he would have to hope that the price he sold the item for was a reasonable one; every transaction would be a guessing game and the cost of losing a criminal prosecution. Similarly, in <u>International Harvester</u>, the Court declared vague a law that allowed farmers to "make any combination for the purpose of controlling [crop] prices unless for the purpose * * * of <u>fixing a price that was greater or less than the real value</u> of the article." 234 US at 855 (emphasis added).

//

United States District Court

For the Northern District of California

Section 9(a)(2) presents a different situation.  To avoid liability, defendants are not required to guess what the reasonable price of electricity is and then conform their conduct so as to create this price or sell at this price.  The criminal manipulation provision does not criminalize the selling of a product at an unreasonable price.  Rather, the criminal manipulation provision prohibits defendants from engaging in intentional conduct aimed at preventing the basic forces of supply and demand from operating properly.  Thus, the criminal manipulation provision is concerned less with the price itself than it is with the process by which the price is set.  See In re Indiana Farm Bureau Cooperative, No 75-14, 1982 WL 30249, *35 n 2 (CFTC 1982) ("[T]he focus should not be as much on the ultimate price, as on the nature of the factors causing it.").  Defendants' reliance upon Cohen Grocery and International Harvester is therefore misplaced.  See United States v Brown, 5 F Supp 81, 84 (SDNY 1933) (similarly distinguishing Cohen Grocery and International Harvester and rejecting a vagueness challenge to an indictment "which, boiled down, denounced as a fraud the substitution of an artificially stimulated and controlled market for an appraisal of the stock in an open and free market").

Furthermore, in the context of this case, the notion of price artificiality is not as elusive as defendants suggest.  The CFTC has explained the concept of price artificiality as follows:

> [T]o determine whether an artificial price has occurred, one must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market.  When the aggregate forces of supply and demand bearing on a particular market are all legitimate, it follows that the price will not be

1
2

               artificial.  On the other hand, when a price is
               effected by a factor which is not legitimate, the
               resulting price is necessarily artificial.

Indiana Farm Bureau, 1982 WL 30249, *35 n 2.

               Whether a particular market force is "legitimate" might
be debatable in any given case, especially those involving schemes
where the alleged manipulation is effected solely by the
defendant's power and position in the market.  But, in the context
of an as-applied challenge, defendants cannot invoke the
uncertainty that may exist at the periphery of commodities
manipulation theory when their alleged conduct is unquestionably
encompassed by the concepts of price manipulation and price
artificiality.  The dissemination of false information into a
commodities market has long been recognized as a form of price
manipulation.  See Soybean Futures, 892 F Supp 2d at 1045-47
(discussing numerous judicial and administrative opinions dealing
with "manipulation by false reports" under the anti-manipulation
prong of § 9(a)(2)).

               This is as it should be.  Fraud and deceit are not
legitimate market forces.  Fundamentally, markets are information
processing systems.  The market price is only as "real" as the data
that inform the process of price discovery.  By the same token, the
market price is "artificial" when the market is misinformed.  Just
as price artificiality implies misinformation, a specific intent to
create an artificial price implies fraud or deceit.  Indeed, Judge
Easterbrook has suggested that "[w]hen there is no fraud, there is
also no manipulation."  Frank H Easterbrook, Monopoly,
Manipulation, and the Regulation of Futures Markets, 59 J Business

30

S103, S118 (1986); cf <u>Schreiber v Burlington Northern, Inc</u>, 472 US 1, 12 (1985) (holding that "the term 'manipulative' as used in § 14(e) [of the Securities Exchange Act of 1934] requires misrepresentation or nondisclosure"); <u>Hochfelder</u>, 425 US at 199 (stating that the word "manipulative" as used in § 10(b) of the Securities Exchange Act of 1934 "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities"). Although the court declines to hold that fraud or deceit is a prerequisite to a finding of price manipulation, it is —— and has always been —— virtually axiomatic that price artificiality can be caused by fraud or deceit upon a market that performs a price discovery function. And, as already discussed, fraud or deceit was inherent in the ordinary meaning of "manipulate" in 1936 when the criminal manipulation provision was enacted. See *supra* III(A)(3)(a).

        To be clear, the court is not departing from the existing judicial formulation of commodities price manipulation. Rather, the court is simply making explicit what has <u>always</u> been implicit: if one intends to deceive the market into setting a price different from the price that would otherwise prevail, one intends to create an artificial price.


                                    ii

        Next, defendants argue that even if this definition of manipulation suffices in some areas of commodity trading and sales, "the government does not come to grips with how the concepts of supply and demand apply in the FERC-regulated wholesale electricity

market." Reply at 11. Specifically, defendants argue that "[w]hatever the 'basic forces of supply and demand' may be in * * * commodities markets generally, they were entirely supplanted in the California electricity market by a set of rules defined in the FERC-approved tariff." Id. According to defendants, it is impossible for a "market participant [in the California electricity market] to know, under the impossibly vague standard for 'manipulation,' when a decision regarding how much of its own product to offer, and at what price, will be deemed a felony." Id. Hence, defendants argue that the criminal manipulation provision is vague as applied to the entire California electricity market and thus, to the present case. The court disagrees for two reasons.

First, it appears that defendants are arguing that the "basic forces of supply and demand" are different or individualized when applied to the California electricity market and thus conduct that might be manipulation in the commodities market generally cannot be manipulation in the California electricity market as it existed in June 2000. Whether defendants had the ability to influence prices in the California electricity market and whether defendants' intentional conduct created a price that did not reflect the forces of supply and demand (as these forces existed in the California electricity market) is a fact-sensitive question for a jury.

Next, and more important, it appears that defendants take an unduly cramped view of the allegations contained in the indictment. Defendants repeatedly argue that a reasonable person would not understand that a unilateral decision to withhold one's

United States District Court

For the Northern District of California

own product from the market could be manipulation so as to affect
the basic forces of supply and demand.  On this point, the court
agrees with defendants and if the indictment was premised entirely
on a defendant's unilateral decision to withhold its own supply,
this would be a very different motion.  A seller of a commodity is
acting quite rationally and legally to withhold his supply from the
market if he believes that in the future the commodity will command
a higher price —— assuming, of course, the seller is under no legal
duty to sell.  But the government does not base the indictment
solely on defendants' mere withholding of electricity.  Defendants'
withholding of electricity is only one act done in furtherance of
defendants' alleged scheme to create the appearance of an
electricity supply shortage in June 2000.  The indictment also
charges that defendants shut down several power plants.  3SI
¶19(a).  Next, the indictment charges that defendants
"exacerbat[ed] the supply shortage through the purchase of
additional electricity from the CalPX and other markets * * *."  Id
¶19(c).  Compare Great Western Food Distributors v Brannan, 201 F2d
476, 478-79 (7th Cir 1953) ("[M]anipulation may be effected * * *
by purchase of all the available cash supply * * *.").  Finally,
and most importantly, defendants are charged with the
"dissemination of false and misleading rumors and information to
the [CA]ISO, brokers and other traders regarding the availability
and maintenance status of" Reliant's power plants.  3SI ¶19(d).
Compare Cargill, 452 F2d at 1163 ("[I]t may be pointed out that one
of the most common manipulative devices [is] the floating of false
rumors which affect future prices * * *.").  While it is clear
defendants take issue with the government's allegations of false

33

United States District Court

For the Northern District of California

rumors and misrepresentations, those questions are factual in nature and must be resolved by a jury.

It bears reemphasis that the court is only permitted to conduct an <u>as applied</u> analysis. <u>Mazurie</u>, 419 US at 550.  To this end, the court need only determine whether a person of ordinary intelligence would understand that <u>these defendants' specific actions</u> in June 2000 were manipulative within the meaning of the criminal manipulation provision.  The court declines to find that defendants could not have been aware that the fraudulent and deceptive conduct alleged in the indictment might subject them to prosecution under § 9(a)(2) of the CEA.


4

The court also declines defendants' lengthy invitation to give dispositive weight to the fact that "the legislative history of the [criminal] price manipulation provision reflects the persistent depth of confusion concerning what conduct constitutes prohibited 'manipulation.'"  MTD at 13-17.  The Supreme Court has stated:  "'Resort to legislative history is only justified where the face of the Act is inescapably ambiguous * * *.'"  <u>Garcia v United States</u>, 469 US 70, 76 n 3 (1984) (quoting <u>Schwegmann Brothers v Calvert Distillers Corp</u>, 341 US 384, 395-96 (1951) (Jackson, J, concurring)); see also <u>United States v Wicks</u>, 833 F2d 192, 193 (9th Cir 1987) ("Unless exceptional circumstances dictate otherwise, 'when we find the terms of a statute unambiguous, judicial inquiry is complete.'" (quoting <u>Burlington Northern Railroad Co v Oklahoma Tax Commission</u>, 481 US 454 (1987))).  The

34

United States District Court

For the Northern District of California

required exceptional circumstances are absent here.

Again adverting to the intent of Congress, defendants' supplemental brief argues that a recent amendment to the FPA reflects Congress's recognition that the criminal manipulation provision is unconstitutionally vague.  Doc #158 at 4.  As part of the Energy Policy Act of 2005, Congress amended the FPA by adding a provision making it unlawful for any entity "to use or employ, in connection with the purchase or sale of electric energy * * * any manipulative or deceptive device or contrivance" and authorizing FERC to promulgate rules directed at the same.  Energy Policy Act of 2005 § 1283, Pub L No 109-58, 119 Stat 594, to be codified at 16 USC § 824 et seq.  Congress explicitly patterned this provision after § 10(b) of the Securities Exchange Act of 1934.  Defendants contend that Congress's decision to pattern the FPA's new manipulation provision after § 10(b), complete with a delegation of rulemaking authority to FERC to define prohibited practices, is tantamount to an acknowledgment that the criminal manipulation provision lacks sufficient definition.

This legislative choice could have been motivated by a number of considerations that have nothing to do with the CEA.  For example, Congress may have looked to § 10(b) because of the sizeable corpus of interpretive case law that has developed around that provision.  In any case, the court is not engaged in a beauty contest between different approaches to the problem of market manipulation.  The court must only determine whether the approach taken by the CEA is constitutionally acceptable as applied to defendants' conduct.

5

Finally, defendants invoke the rule of lenity.  But the term "manipulate" is not ambiguous and, therefore, the rule of lenity is inapplicable.  <u>United States v Shabani</u>, 513 US 10, 17 (1994) ("The rule of lenity * * * applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.").

Putting aside the theoretical question whether a person of ordinary intelligence would understand that defendants' conduct was prohibited, it is sufficiently clear that defendants themselves knew their conduct was prohibited.  Because all parties are familiar with them and in the interest of protecting the confidentiality of these criminal proceedings, the court will not recite portions of the taped telephone conversations offered by the government.  It should suffice to say that one defendant actually uses the phrase "market manipulation" to explain why one of Reliant's generating facilities was idle.  Moreover, in other telephone conversations some defendants appear to misrepresent the reasons for shutting down some of Reliant's power plants.

While the court does not afford much, if any, weight to these calls in addressing defendants' vagueness challenge, these telephone calls certainly do not add credibility to defendants' claims that they were unaware that their conduct in June 2000 was illegal.  See <u>United States v Weitzenhoff</u>, 35 F3d 1275, 1289 (9th Cir 1993) ("We are further persuaded that appellants had adequate notice of the illegality of their [conduct] by the considerable pains they took to conceal their activities.").

Applying the less exacting vagueness test mandated by the Ninth Circuit in construing statutes regulating economic activity, <u>Iverson</u>, 162 F3d at 1021, the court concludes that the criminal manipulation provision is not vague as applied to the facts of this case.   Accordingly, defendants' motion to dismiss count six of the indictment on vagueness grounds is DENIED.


                                  B

Assuming arguendo that the criminal manipulation provision is not unconstitutionally vague, defendants assert five additional grounds for dismissing count six.  First, defendants argue that the CEA regulates only futures markets, not physical markets.  Next, assuming the CEA is applicable to physical markets, defendants argue it is not applicable to wholesale electricity markets, which are regulated exclusively by FERC.  Similarly, defendants argue that the filed rate doctrine precludes application of the CEA to conduct that is regulated by FERC.  Fourth, defendants argue that the conduct alleged in the indictment does not constitute manipulation.  Finally, defendants suggest that the indictment does not sufficiently allege that defendants had the ability to influence prices.  The court addresses these arguments in turn.


                                  1

Defendants assert that the CEA is concerned only with manipulative conduct occurring in the market for trading futures contracts and options and not physical or "cash" markets like the

CalPX and CAISO spot markets.

        Although certain provisions of the CEA are concerned exclusively with transactions in futures contracts and similar derivative instruments, other provisions, including those dealing with price manipulation, are not so limited in scope.  See Philip McBride Johnson and Thomas Lee Hazen, <u>Commodities Regulation</u> ¶1.02[3] (3d ed 2003) ("Spot market transactions are not presently subject to regulation under the commodity laws (<u>other than for price manipulation</u> and certain position limits) * * *." (emphasis added)).  One example of a provision exclusively concerned with futures contracts is § 4 of the CEA, 7 USC § 6, which regulates transactions in "contract[s] for the purchase or sale of a commodity for future delivery."  The definition of "future delivery" expressly excludes "any sale of any cash commodity for deferred shipment or delivery."  Id § 1a(19).  This is known as the "cash forward" exclusion.  <u>CFTC v Co Petro Marketing Group, Inc</u>, 680 F2d 573, 577-78 (9th Cir 1982).  Although courts have sometimes struggled to distinguish cash forwards from futures, they have never doubted that <u>§ 4</u> does not apply to transactions in cash or spot markets.  See <u>In re Bybee</u>, 945 F2d 309, 312-15 (9th Cir 1991); <u>Co Petro</u>, 680 F2d at 577-79.  On occasion, these courts have made sweeping statements that could be interpreted as suggesting that the CEA is categorically inapplicable to transactions in cash or spot markets.  See <u>Salomon Forex, Inc v Tauber</u>, 8 F3d 966, 970 (4th Cir 1993) (discussing the legislative history of the CEA and broadly stating that "Congress never purported to regulate 'spot' transactions * * * or 'cash forward' transactions").  But, significantly, those courts were not construing or applying CEA

provisions that apply to transactions in "any commodity in interstate commerce."

Defendants' reliance on such cases is accordingly misplaced. Judicial construction of the cash forward exclusion for purposes of § 4 is inapposite to the charge of commodities price manipulation in this case, which is based on § 9(a)(2). Unlike § 4, § 9(a)(2) makes it a crime for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity * * *." 7 USC § 13(a)(2) (emphasis added). The comma, followed by the "or" leads the court to conclude, as other courts have, that "Congress clearly intended the term 'interstate commerce' to have a meaning distinct from the phrase 'for future delivery on or subject to the rules of any registered entity.'" United States v Valencia, 2003 WL 23174749, *29 (SD Tex 2003). If Congress had intended the criminal manipulation provision of § 9(a)(2) to apply only to futures contracts, the phrase "any commodity in interstate commerce" would have been superfluous. Because the Ninth Circuit directs lower courts to "give meaning to every word of a statute," Carson Harbor Village, Ltd v Unocal Corp, 270 F3d 863, 883 (9th Cir 2001) (emphasis added), the court concludes that the criminal manipulation provision of § 9(a)(2) is not limited to futures contracts. Rather, according to the plain meaning of the text, the criminal manipulation provision also applies to "any commodity in interstate commerce." Defendants do not dispute that the electricity at issue in this case fits that description.

//

United States District Court

For the Northern District of California

Moreover, defendants concede that the government has recently filed two criminal indictments under the CEA based upon a defendant's conduct in a physical (i e, spot) market. MTD at 23 n 26 (citing <u>Valencia</u>, 2003 WL 23174749, and <u>United States v Geiger</u>, No H-02-712, slip opinion, (SD Tex 2003)). Further, the CFTC has brought a civil action under § 9(a)(2) for manipulation of the natural gas spot market. See <u>CFTC v Enron Corp</u>, 2004 WL 594752 (SD Tex 2004).

2

Next, defendants argue that even if the scope of the CEA includes physical markets, it cannot be applied to electricity physical markets because those markets are regulated exclusively by FERC. The court disagrees.

The Federal Power Act (FPA), 16 USC §§ 791a-828c, confers upon FERC the "'<u>exclusive</u> authority to regulate the transmission and sale at wholesale of electricity energy in interstate commerce.'" <u>Transmission Agency of Northern California v Sierra Pacific Power Co</u>, 295 F3d 918, 928 (9th Cir 2002) ("<u>TANC</u>") (quoting <u>New England Power Co v New Hampshire</u>, 455 US 331, 340 (1982) (emphasis in original)). According to defendants, "application of the CEA to the [defendants'] alleged conduct conflicts with the exclusive jurisdiction Congress conferred on FERC to regulate all matters affecting the sale and transmission of wholesale electricity." MTD at 28. This is further evidenced, according to defendants, by the 2005 amendments to the FPA, which, as already noted, authorize FERC to promulgate rules proscribing manipulative

40

and deceptive practices in wholesale electricity markets.  Doc #158 at 6.  While defendants' argument is logical, Supreme Court and circuit precedent stand in contrast to defendants' position.

First, defendants' argument overlooks the Supreme Court's decision in Otter Tail Power Co v United States, 410 US 366 (1973). In Otter Tail, the United States brought suit against Otter Tail, an electric utility, alleging illegal monopolization in violation of § 2 of the Sherman Act.  Id at 368.  Specifically, the United States alleged that Otter Tail had obtained a monopoly by (among other things) refusing to sell power at wholesale to municipalities with local distribution systems.  Id.  Otter Tail argued that it was immune from antitrust regulation because the FPA gave the Federal Power Commission (predecessor to FERC) the sole authority to regulate the sale of electricity.  Id at 372.  The Court disagreed, stating that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy * * *."  Id. Hence, the Court concluded that Otter Tail was subject to antitrust scrutiny by the United States regardless of the FPA's grant of authority to the Federal Power Commission.

Because the Court has held that wholesale electricity markets are subject to the scrutiny of the antitrust laws, wholesalers are prohibited from engaging in a plethora of activities, including refusing to deal, price fixing, boycotting and dividing markets territorially.  Otter Tail thus makes clear that the FPA does not provide the impregnable armor defendants seek to employ.  This court has followed the Supreme Court's instruction in Otter Tail.  See People of the State of California v Mirant

41

United States District Court
For the Northern District of California

Corp, 266 F Supp 2d 1046, 1056-57 (ND Cal 2003) (Walker, J)
(stating that, under Otter Tail, "the FPA does not provide blanket
immunity against * * * federal antitrust claims").

Case law from other circuits is also instructive.  In
United States v Palumbo Bros, Inc, 145 F3d 850 (7th Cir 1998), the
Seventh Circuit addressed a situation similar to the one presently
before the court.  In Palumbo, defendants were two major highway
construction firms in Chicago, engaged in various projects and
activities related to the construction, maintenance and repair of
streets and expressways.  Defendants entered into construction and
repair contracts with the Illinois Department of Transportation and
local municipalities and employed many unionized employees who were
represented by the International Brotherhood of Teamsters.  Id at
856-57.  In 1996, defendants were indicted for (among other things)
allegedly scheming "to defraud their employees [and] the Unions
* * * by depriving them of money to which they were entitled under
the terms and conditions of the collective bargaining agreements."
Id at 857.  Based upon this conduct, defendants were charged with
violating RICO, 18 USC § 1961 et seq, the mail fraud statute, 18
USC § 1341, and ERISA, 29 USC § 1001 et seq.  Id at 856.

Defendants moved to dismiss this portion of the
indictment, arguing that "the indictment fail[ed] to charge them
with criminal violations of RICO, mail fraud and ERISA, but instead
alleged unfair labor practices and breaches of collective
bargaining agreements in violation of the National Labor Relations
Act (NLRA), 29 USC § 151 et seq, and the Labor Management Relations
Act (LMRA), 29 USC §§ 141-197."  Id.  In other words, defendants
argued that the NLRA and LMRA preempted criminal claims made under

RICO, ERISA and the mail fraud statute inasmuch as those claims are based on conduct that constitutes unfair labor practices, because the NLRA grants primary jurisdiction to the National Labor Relations Board (NLRB) "to review and remedy unfair labor practices." Id at 861. The district court agreed and dismissed these portions of the indictment as preempted. A three-member panel of the Seventh Circuit unanimously reversed.

The panel began by observing that "'it is a cardinal principle of construction that * * * when there are two acts upon the same subject, the rule is to give effect to both.'" Id at 862 (quoting United States v Borden Co, 308 US 188, 198 (1939)). "Congressional intent behind one federal statute should not be thwarted by the application of another federal statute if it is possible to give effect to both laws." Id.

Applying these principles, the Palumbo panel found that the intersection of two federal statues "does not implicate the constitutional concerns underlying [preemption]." Id at 862. Moreover, the panel stated that even if the doctrine of preemption applied to the intersection of federal criminal law and the NLRA, "we are not convinced that this indictment presents an unresolvable conflict between the preemptive force of the NLRA and the criminal statutes charged that requires us to apply one body of law, labor or criminal, to the exclusion of the other." Id at 863. "It is not clear to us that the primary jurisdiction of the NLRB is violated by the government's indictment and potential prosecution of the defendants' alleged criminal conduct." Id. In other words, the panel found that because the criminal prosecution would not prohibit the NLRB from analyzing and resolving any alleged unfair

United States District Court

For the Northern District of California

labor practices, the criminal prosecution did not violate the NLRB's primary jurisdiction.

In reaching this conclusion, the panel stated that because "[1] each criminal statute explicitly proscribes the conduct alleged in the indictment and [2] [there is an] absence of any express congressional intent that unfair labor practices, which also independently qualify as violations of criminal statutes, are insulated from criminal liability, we find that the jurisdiction of a federal district court to adjudicate a criminal prosecution does not infringe or interfere with the primary jurisdiction of the NLRB."   Id.

The court finds the reasoning of <u>Palumbo</u> highly persuasive.   First, as the court has concluded above, the criminal manipulation provision explicitly proscribes the conduct allegedly engaged in by defendants.   Next, Congress has not expressed that enactment of the FPA was intended to insulate from criminal liability any manipulative practice in the wholesale electricity market which independently qualifies as a violation of a criminal statute.   Nor do the recent amendments to the FPA cited by defendants reveal an intent to keep electricity wholesalers outside the reach of the CEA's anti-manipulation provisions.

Finally, the court fails to see how the government's prosecution of defendants will prohibit FERC from regulating and remedying the conduct which purportedly caused the 2000 energy crisis; indeed, FERC has already attempted civilly to do so. Accordingly, like the <u>Palumbo</u> panel, the court finds no unresolvable or repugnant conflict between the FPA and the criminal

44

manipulation provision.

   In support of their argument that the wholesale electricity market is subject to regulation by FERC only, defendants rely on several inapposite cases.  In _California ex rel Lockyer v Dynegy, Inc_, 375 F3d 831 (9th Cir 2004), the state of California sought restitution, injunctive relief, disgorgement and civil penalties against several producers and traders of wholesale electricity for double-selling reserve generation capacity during the 2000 energy crisis in violation of Cal Bus & Prof Code § 17200 et seq, California's prohibition on unfair business practices.  Id at 836.  The _Dynegy_ defendants argued that California's state law tort claims were preempted by the FPA and its delegation of authority to FERC "to regulate the transmission and sale at wholesale of electricity in interstate commerce."  Id at 849.  The Ninth Circuit agreed, holding that California could not encroach on "an area reserved exclusively to FERC, both to enforce and to seek remedy."  Id at 852; see also _Duke Energy Trading & Marketing, LLC v Davis_, 267 F3d 1042, 1057 (9th Cir 2001) ("'[I]t is common ground that if FERC has jurisdiction over a subject, _the States_ cannot have jurisdiction over the same subject.'" (quoting _Mississippi Power & Light v Mississippi Power ex rel Moore_, 487 US 354, 377 (1988) (Scalia, J, concurring)) (emphasis added).  Hence, _Dynegy_ and _Duke Energy_ were premised on federal preemption of _state_ law claims relating to the wholesale electricity market; neither involved two competing federal statutes.

   The same is true of _Public Utility District No 1 of Snohomish County v Dynegy Power Marketing_, 384 F3d 756 (9th Cir 2004).  In _Snohomish_, a local Washington utility that bought

electricity during the 2000 energy crisis at allegedly inflated prices brought suit against several electricity generators and wholesalers under California's antitrust and unfair competition laws. Id at 759. The Ninth Circuit affirmed the district court's conclusion that these state law claims encroached on FERC's exclusive jurisdiction. Id at 761. Federal preemption of state law property and tort claims was also the gravamen of <u>TANC</u>, 295 F3d at 927-29.

But federal preemption of state law is not at issue in the present case. Here, the court is faced with two federal laws that arguably cover the same conduct. In such a scenario (which appears to have arisen rarely), the court cannot, and thus ought not, jettison the Supreme Court's directive that "Congressional intent behind one federal statute should not be thwarted by the application of another federal statute <u>if it is possible to give effect to both laws</u>." <u>Borden</u>, 308 US at 198 (emphasis added). As the court discussed above, it is possible to give effect to both laws in the present case.


3


Defendants argue that the filed rate doctrine prohibits application of the criminal manipulation provision to defendants' FERC-regulated conduct.

"Since the 1920s the 'filed rate' or 'filed tariff' doctrine has barred antitrust recovery by parties claiming injury from the payment of a filed rate for goods or services." <u>County of Stanislaus v Pacific Gas & Electric Co</u>, 114 F3d 858, 862 (9th Cir

United States District Court

For the Northern District of California

1997) (citing <u>Keogh v Chicago Northwestern Railway Co</u>, 260 US 156

(1922)).  In <u>Keogh</u>, petitioner, a private manufacturer of excelsior

and flax tow, alleged that respondents, a group of interstate

freight carriers, formed a conspiracy to fix the rate charged by

interstate carriers in violation of section 1 of the Sherman Act.

260 US at 159-60.  Petitioner sought treble damages in a private

antitrust action.  Id.  The respondents' rates, however, had been

submitted to and approved by the Interstate Commerce Commission

(ICC).  Id.  The Court rejected petitioner's claim, agreeing with

respondents that the ICC approval of their rates conclusively

established that the rates were "reasonable and nondiscriminatory."

Id at 161.  In concluding that petitioner could not maintain a

<u>private</u> cause of action for damages against respondents, however,

<u>Keogh</u> made clear that the filed-rate doctrine did not preclude the

<u>government</u> from bringing suit against the respondents under the

antitrust laws, especially criminal proceeding:

> [U]nder the [Sherman Act], a combination of carriers
> to fix reasonable and non-discriminatory rates may
> be illegal; and if so, the Government may have
> redress by criminal proceedings [under the antitrust
> laws].  * * *  <u>The fact that these rates had been
> approved by the [ICC] would not, it seems, bar
> proceedings by the Government</u>.

Id at 161-62 (citations omitted) (emphasis added).

In 1951, the Court applied the filed rate doctrine to

rates filed with FERC's predecessor, the Federal Power Commission

(FPC).  See <u>Montana-Dakota Utilities Co v Northwestern Public

Services Co</u>, 341 US 246 (1951).  In <u>Montana-Dakota</u>, the Court

rejected petitioner's claim that respondent utility companies'

allegedly fraudulent conduct had led to illegal and unreasonably

47

1  high rates on the ground that the rates were reasonable because
2  they were filed with the FPC.  Id at 251-52.  But like Keogh,
3  Montana-Dakota applied the filed rate doctrine to a private claim
4  seeking to recover damages.

5          The viability of the filed rate doctrine (which from its
6  inception suffered from extensive criticism) came before the Court
7  in Square D Co v Niagra Frontier Tariff Bureau, Inc, 476 US 409,
8  410 (1986).  In Square D, petitioner commercial shippers utilized
9  respondent interstate carriers' services to ship goods between the
10 United States and Canada.  Id at 412.  Petitioners alleged that
11 respondents had illegally fixed freight transportation costs rates
12 in violation of § 1 of the Sherman Act and sought, among other
13 remedies, treble damages.  Id at 410-12.  Respondents argued that
14 since their rates were filed with the ICC, the filed rate doctrine
15 barred petitioners' claim.  Id at 414.  Finding the facts virtually
16 indistinguishable from Keogh, the district court dismissed the
17 complaint, holding that the claims violated the filed rate doctrine
18 and the Second Circuit affirmed the dismissal of the treble damages
19 claim.  The Court granted certiorari to determine whether Keogh
20 should be overruled.  Id at 414-15.  The Court, per Justice
21 Stevens, declined to overrule Keogh and held that petitioners'
22 claims were precluded.

23         While the Court upheld the validity of the filed rate
24 doctrine in Square D, the Court reemphasized the limited scope of
25 the doctrine, echoing the words of Justice Brandeis in Keogh.  Id
26 at 415 n 17.  Specifically, in rejecting petitioners' argument that
27 the filed rate doctrine essentially created an "immunity" from
28 antitrust scrutiny, the Court stated:

                                48

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

> We disagree [] with petitioners' view that the issue in <u>Keogh</u> and in this case is properly characterized as an "immunity" question.  The alleged collective activities of the defendants in both cases were <u>subject to scrutiny under the antitrust laws by the Government and to possible criminal sanctions or equitable relief</u>.  <u>Keogh</u> simply held that an award of treble <u>damages</u> is not an available remedy for a <u>private</u> shipper claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation.

8

Id at 422 (emphasis added).

9

10

11

12

13

14

15

16

17

18

19

Accordingly, under the clear language of <u>Keogh</u> and <u>Square D</u>, the filed rate doctrine is not a bar to the kind of proceedings currently before the court:  criminal enforcement proceedings by the federal government.  Defendants' attempt to characterize <u>Keogh</u> and <u>Square D</u>'s limitations on the filed rate doctrine as "dicta" is unpersuasive.  Reply at 26.  Moreover, to the extent defendants attempt to distinguish criminal antitrust prosecutions of the type contemplated by <u>Keogh</u> and <u>Square D</u> from the present case on the ground that the former "do not require proof of damages to establish a violation," id, the court disagrees for the reasons below.

20

21

22

23

24

25

26

27

28

Notwithstanding that the filed rate doctrine has never been used to bar a criminal prosecution, defendants argue that the filed rate doctrine prohibits application of the criminal manipulation provision to their allegedly manipulative conduct.  Specifically, defendants argue that because the filed rate doctrine forbids inquiries into some hypothetical price other than that actually approved by FERC, the commodities price manipulation charge violates the filed rate doctrine.  This is so, according to defendants, because proof that an artificial price existed requires

proof that some different, "natural" price would have obtained absent defendants' conduct.  MTD at 30-34.  The court disagrees.

As already discussed, whether or not a price is artificial does not necessarily turn on a comparison of that price with some other price that would have prevailed in the absence of illegitimate market forces.  See *supra* III(A)(3)(c)(i).  Rather, the inquiry focuses primarily upon whether illegitimate forces were at work in the marketplace.  Indeed, the CFTC has suggested that a comparison of the alleged artificial price with (as defendants put it) a "natural" price is nonessential.  <u>Indiana Farm Bureau</u>, 1982 WL 30249, *35 n 2 ("[W]hen a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial.").  This is not to say that evidence of prices set by wholly legitimate market forces is irrelevant.  If such proof is offered, however, it is only incidental.  Further, to the extent that any comparative evidence consists of prices <u>actually</u> set by the market outside of the time period at issue in this case, the fact finder would not be required to "assum[e] a hypothetical rate different from that actually set by FERC."  <u>TANC</u>, 295 F3d at 930.

In this regard (and apart from the fact that they all involved state law claims, see *supra* III(B)(2)), the following cases are distinguishable:  <u>Snohomish</u>, where claims for monetary relief essentially "ask[ed] the district court to determine the rates that 'would have been achieved in a competitive market,'" 384 F3d at 761; <u>Pub Util Dist No 1 of Grays Harbor County v Idacorp Inc</u>, 379 F3d 641 (9th Cir 2004), where calculation of damages "would [have] require[d] the court to set damages by assuming a hypothetical rate, the 'fair value,' in violation of the filed rate

*United States District Court*

For the Northern District of California

doctrine," id at 651; and <u>TANC</u>, where, in order to grant the requested relief, the court "would have [had] to hold that under state contract law TANC was entitled to 4800 MW of transfer capacity" (impermissible because "state law can no more assume how FERC would allocate access to interstate transmission capacity than it can assume how FERC would set rates"), 295 F3d at 931.

In sum, the court concludes that this case is not different from the federal prosecutions for antitrust violations to which the United States Supreme Court has assumed the filed rate doctrine does not apply.  Accordingly, the court concludes the filed rate doctrine does not bar application of the criminal manipulation provision to the conduct alleged in the indictment.


4

Next, defendants argue that the "alleged conduct is not 'manipulation' as a matter of law."  MTD at 34.  Specifically, defendants contend that unilateral supply decisions cannot constitute commodities price manipulation.  As the court has already explained, if count six were predicated solely upon defendants' unilateral supply decisions, "this would be a very different motion."  *Supra* III(A)(3)(c)(ii).  But the indictment alleges that artificial prices were effected through the illusion of a supply shortage, which was created by the interplay between defendants' supply and bidding practices and the false and misleading rumors and information they allegedly disseminated into the market.  The jury could find that defendants' conduct <u>taken as a whole</u> constituted commodities price manipulation.

1    Similarly, the fact that withholding of supply might have
2 been permitted by the rules governing the California wholesale
3 electricity market in 2000 does not require dismissal of count six.
4 Whether the conduct alleged in the indictment, taken as a whole,
5 violated those rules is a question the court need not resolve,
6 because defendants do not stand accused of violating those rules;
7 they are accused of manipulating the price of a commodity in
8 interstate commerce in violation of 7 USC § 13(a)(2).

9

10

11                                    5

12    In their reply memorandum, almost as an afterthought,
13 defendants challenge the sufficiency with which the indictment
14 alleges that defendants had the ability to influence prices.

15    "The sufficiency of an indictment is judged by 'whether
16 the indictment adequately alleges the elements of the offense and
17 fairly informs the defendant of the charge * * *.'" United States
18 v Blinder, 10 F3d 1468, 1471 (9th Cir 1993) (quoting United States
19 v Buckley, 689 F2d 893, 897 (9th Cir 1982)); see also FRCrP 7(c)(1)
20 (stating that an indictment must be a "plain, concise and definite
21 written statement of the essential facts constituting the offense
22 charged").  The indictment alleges that in 1996 Reliant "assumed
23 control of approximately 20% of all gas-fired power generation in
24 the State of California."  3SI ¶7.  Although defendants take issue
25 with the indictment's characterization of Reliant's market share,
26 Reply at 29 n 21, the court must presume the truth of the
27 allegations, Blinder, 10 F3d at 1471.  Given that the indictment
28 also alleges that defendants disseminated false and misleading

United States District Court

For the Northern District of California

rumors and information to the market, the court finds the
indictment sufficiently alleges ability to influence prices.  See
Soybean Futures, 892 F Supp at 1053 ("When these alleged
misrepresentations are factored into their alleged ability to
influence prices, one might reasonably infer that [d]efendants
might not have required as large a position in the * * * market as
would a manipulator relying on market power alone.").


                                 IV

          Finally, defendants move the court to dismiss counts two
through five of the indictment, which allege wire fraud.
Defendants' motion has two dimensions.  First, defendants argue
that the wire fraud statute, 18 USC § 1343, is unconstitutionally
vague as applied to this case.  Next, defendants argue that the
indictment "fails to allege a valid wire fraud claim."  Neither
argument is persuasive.


                                  A

          Defendants suggest in passing that the wire fraud statute
fails to provide constitutionally sufficient notice "because
persons of average intelligence in a FERC-regulated market could
not reasonably understand that conduct not prescribed by market
rules would nevertheless be prohibited by law."  MTD at 27.  For
reasons already discussed in the context of defendants' arguments
for dismissing count six, the court disagrees.  That regulation by
FERC does not equate to immunity from government enforcement
proceedings or criminal prosecutions was established no later than

                                 53

<u>Otter Tail</u>.  See *supra* III(B)(2).  To the extent defendants claim ignorance of this established law, that is no excuse.  See, e g, <u>Shevlin-Carpenter Co v Minnesota</u>, 218 US 57, 68 (1910).  Accordingly, the court finds it unnecessary to address the government's contention that defendants' conduct was in fact prohibited by the rules governing the wholesale electricity market in California.

B

In arguing that the scheme alleged in the indictment cannot support the wire fraud charges, defendants first draw a bead on ¶19(b), which alleges that defendants engaged in "the physical and economic withholding of electricity from the California spot markets, by declining to submit supply bids and by submitting false and misleading supply bids at prices designed to ensure that the bids were not accepted."  According to defendants, the "idea of a 'false and misleading bid' is incoherent on its face. * * *  A bid could only be 'false' if the bidding entity had no capacity to fulfill it."  MTD at 42.  But the "falsity" of bids as such is irrelevant, see <u>United States v Woods</u>, 335 F3d 993, 998-99 (9th Cir 2003), especially when, as the government concedes, "their import is that they contributed to the overall scheme to defraud, not that they independently amounted to a 'false representation,'" Opp at 39 n 45.

Next, defendants argue that the wire fraud charges are invalid to the extent they hinge on defendants' failure to disclose the true reasons for their bidding and supply decisions.  If non-

disclosure were the lynchpin of the alleged scheme to defraud, again, "this would be a very different motion." *Supra* III(A)(3)(c)(ii). But that is not the scheme alleged. To the contrary, the indictment postulates, albeit not explicitly, that by disseminating false information regarding Reliant's generating capacity, defendants effectively told the market that Reliant's sudden reduction in supply was <u>not</u> motivated by an intent merely to increase the price of electricity.

Nonetheless, defendants contend that "it is impossible to ignore that a wire fraud scheme based on allegedly false 'cover-up' conversations is quite different from the scheme actually alleged in the indictment." Reply at 30. The court disagrees with this myopic reading of the indictment, which clearly alleges that defendants shut down certain Reliant power plants, withheld electricity from the market, purchased electricity from other markets, 3SI ¶¶19(a)-(c), and then explained these anomalies to the market through "the dissemination of false and misleading rumors and information to the ISO, brokers, and other traders regarding the availability and maintenance status of, and environmental limitations on, [Reliant]'s power plants," id ¶19(d).

Defendants argue that ¶19(d) cannot stand on its own as a basis for the wire fraud charges. Because the court declines to strike any of the allegations contained in ¶¶19(a)-(c), defendants' argument is moot. Similarly, defendants argue that if the court dismisses count six, the remaining charges cannot stand. To the extent this argument has not been mooted by Indictment S3, it is mooted by the court's conclusion that count six should not be dismissed.

V

In sum, defendants' joint motion to dismiss Indictment S3 as barred by the statute of limitations is DENIED.  Defendants' original joint motion to dismiss the indictment is DENIED.


SO ORDERED.


_____

VAUGHN R WALKER

United States District Chief Judge